UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

JANICE LYN GAGLIARDO,

                              Plaintiff,                    20-CV-05453 (SN)

              -against-                                     <u>OPINION & ORDER</u>

COMMISSIONER OF SOCIAL SECURITY,

                              Defendant.

------------------------------------------------------------------X

SARAH NETBURN, United States Magistrate Judge:

        Plaintiff Janice Lyn Gagliardo seeks review of the decision of the Commissioner of

Social Security (the "Commissioner") finding that she was not disabled or entitled to disability

insurance benefits ("DIB") under the Social Security Act (the "Act"). The parties have cross-

moved for judgment on the pleadings. Gagliardo's motion is DENIED, and the Commissioner's

motion is GRANTED.

BACKGROUND

I.      Administrative History

        Gagliardo applied for DIB on December 15, 2016. <u>See</u> Administrative Record ("R.") 18.

She alleged that she was disabled beginning September 22, 2016, due to arthritis of the spine and

hips, disc bulge at the L2-L3, L3-4, L4-L5, and L5-S1 vertebral levels, L3-L4 posterior ligament

hypertrophy, L4-L5 central disc protrusion, and L5-S1 left neural foramen stenosis. R. 61-62.

Her application was denied, and she requested a hearing before an administrative law judge

("ALJ") to review her case. R. 18. Gagliardo appeared for a hearing before ALJ Sharda Singh on

December 10, 2018, and ALJ Singh issued a decision denying her claim on March 13, 2019. R.

18-24. On July 13, 2020, the Appeals Council denied Gagliardo's request for review, making the ALJ's decision final. R. 1-4; <u>see</u> 20 C.F.R. § 404.981; 42 U.S.C. § 405(g).

## II.    Gagliardo's Civil Case

Gagliardo filed her complaint on July 15, 2020, seeking review of the ALJ's decision. <u>See</u> ECF No. 1. She requested that the Court set aside the decision and grant her DIB or, alternatively, remand the case for further proceedings. <u>Id.</u> at 2. The Commissioner answered by filing the administrative record, and the parties cross-moved for judgment on the pleadings. <u>See</u> ECF Nos. 14, 16, 18. Gagliardo argues that the ALJ's determination of her residual functional capacity ("RFC") is not supported by substantial evidence because ALJ Singh rejected the only medical opinion in the record. <u>See</u> ECF No. 17. The Commissioner contends that the ALJ's RFC determination was supported by substantial evidence and that the record does not support the sole medical opinion. <u>See</u> ECF No. 19.

The Honorable Analisa Torres referred this case to my docket and the parties consented to my jurisdiction, pursuant to 28 U.S.C. § 636(c). ECF Nos. 7, 15.

## III.    Factual Background

### A.  Non-Medical Evidence

Gagliardo was born in 1956 and was between 60 and 62 years old during the period at issue. R. 34-35, 61. She completed college and, before she applied for DIB, worked for over 15 years as a merchandising manager, style consultant, sales associate, and personal shopper. R. 37-41, 66-67. She stopped working when her employer passed away. R. 41. When she worked as a sales associate, Gagliardo worked around 7 hours a day, carried up to 10 pounds, and stood, walked, and sat throughout the day. R. 38. At previous jobs, she spent most or all of the day standing. R. 39. She applied for DIB after the onset of her conditions. R. 61-62.

At her hearing before the ALJ, Gagliardo testified that she had pain in her back that radiated to her hips. R. 43. As a result, she had trouble sitting and could sit for about 30 minutes at a time before standing up or bending over to stretch out her lower back. R. 43, 51-52. Gagliardo could stand for about 10 minutes before needing to move around and could walk 10 city blocks before stopping. R. 44. She did not use a cane or walker. R. 44. She had trouble lifting things: she could lift a gallon of milk with both hands, or with one hand if her back was against a wall. R. 44. She could comfortably carry about five to eight pounds. R. 52.

For her back and hip pain, Gagliardo saw a chiropractor, had appointments every three months with an orthopedic doctor, and saw another doctor for pain management. R. 42. She also did regular exercises. R. 42. Gagliardo took Percocet three times a day to ease her back and hip pain. R. 46, 224. She did not experience any side effects from the medication. R. 50.

Gagliardo testified that she lived in a second-floor apartment and sometimes had trouble going down the steps but not up. R. 36. She was able to do "a little bit" of cooking but could not vacuum or mop. R. 45. She could do laundry but could not carry a full laundry basket. R. 45. She went to the supermarket only for small grocery loads and used a shopping cart even for a few items. R. 45. Gagliardo had pain when bending over to put on pants, socks, or shoes, and had to do so slowly, but otherwise had no trouble getting dressed. R. 46. She did not sleep well. R. 53.

Gagliardo typically spent her time at home reading in a recliner, painting while standing and sitting, and using a computer while sitting. R. 50-51. She drove a couple of times a week to places like the grocery store and the gym, and she drove to the hearing. R. 52. At the gym, she stretched for about 30 minutes at her doctors' recommendation. R. 48-49. She went to the movies every two months or so. R. 50. Gagliardo traveled to Iceland for four days and drove to see her

mother in Connecticut. R. 46-48. While traveling to Iceland, she used an electric cart to get around the airport and had trouble wheeling her carry-on luggage. R. 47-48.

Doug Lear, a vocational expert, also testified at Gagliardo's hearing. R. 56-58. He classified Gagliardo's past work as a salesclerk as exertionally light and unskilled, with a specific vocational preparation ("SVP") level of 3.[1] R. 57. Her past work as a personal shopper was also exertionally light, but skilled, with an SVP of 5. R. 57. Lear was asked to consider two hypotheticals. First, he was asked to consider a hypothetical person of Gagliardo's age, education, and work experience who was limited to a light exertional level, could never climb ladders, ropes, or scaffolds, and could occasionally climb ramps, stairs, balance, stoop, kneel, crouch, and crawl. R. 57. He testified that such a person could perform her past work as a salesclerk or personal shopper. R. 57.

Second, Lear was asked to consider a hypothetical person with the same postural limitations described above but who was limited to a sedentary exertional level and would have to shift positions or stand up for 1 to 2 minutes every 30 minutes. R. 57-58. He testified that Gagliardo's past work would be precluded in that hypothetical. R. 58. The ALJ did not ask Lear what kind of work such a person would be able to perform instead. R. 58.

### B. Treating Medical Evidence

#### 1. Bella M. Malits, MD

In November of 2014, Gagliardo was referred to Dr. Malits for pain management and therapeutic injections to treat her back pain. R. 180. She saw Dr. Malits on numerous occasions between 2015 and 2018: 7 times in 2015, R. 280-81, 282-83, 285-86, 287, 288-89, 290; 7 times

---

[1] An SVP level of 3 indicates that it would take a claimant between one and three months to learn the techniques, acquire the information, and develop the facility needed for average performance in the job. Soc. Sec. Admin., Program Operations Manual System, at DI 25001.001A.77, https://secure.ssa.gov/poms.nsf/lnx/0425001001 (last visited Mar. 8, 2022).

in 2016, R. 238-39, 240-41, 242-43, 244, 292-93, 294-95, 296-97; 5 times in 2017, R. 245-46, 341-42, 343-44, 345-47, 348-50; and 3 times in 2018, R. 351-53, 354-56, 357-59. At every appointment but one in 2015 and one in 2017, Dr. Malits noted that Gagliardo's gait was non-antalgic,[2] that she did not use any walking aids, and that she did not have any difficulty getting on and off the examination table. But see R. 288-89 (antalgic gait), 348-50 (difficulty getting on examination table). At a March 23, 2015 appointment, Gagliardo rated her pain at an 8 out of 10, R. 282-83, and at November 11, 2016 and January 13, 2017 appointments, she had pain and limitation with extension of her lumbar spine, R. 242, 245.

Dr. Malits performed multiple lumbar facet joint blocks, medial branch blocks, and epidural steroid injections to diagnose and treat Gagliardo's back pain.[3] In 2015, she performed bilateral L5-S1 facet joint blocks in July, R. 257-60, an interlaminar L5-S1 lumbar epidural steroid injection in October, R. 261-65, and L4 and L5 medial branch nerve blocks in December, R. 266-71. The July 2015 facet joint blocks helped with Gagliardo's pain, but the December medial branch blocks did not. R. 288-90, 292-93. In 2016, Dr. Malits performed an L3-L4 facet joint block in April, R. 272-76, a L5-S1 medial branch nerve block in June, R. 277-79, 300-02, and an L2-L3 medial branch nerve block and L3-L4 lumbar facet joint block in December, R. 247-56. None of the 2016 procedures provided relief. R. 245-46, 294-97.

At the vast majority of Gagliardo's appointments, both before and after her claimed onset of disability, Dr. Malits noted that taking Percocet up to three times a day provided "good relief"

---

[2] An antalgic gait is "an abnormal pattern of walking secondary to pain that ultimately causes a limp." Nadja Auerbach & Prasanna Tadi, Antalgic Gait in Adults, https://www.ncbi.nlm.nih.gov/books/NBK559243/ (last updated Sept. 29, 2021).

[3] "A facet block is an injection of local anesthetic and steroid into a joint in the spine. A medial branch block is similar, but the medication is placed outside the joint space near the nerve that supplies the joint called the medial branch (a steroid may or may not be used)." Brigham & Women's Hosp., Facet and Medial Branch Blocks, https://www.brighamandwomens.org/anesthesiology-and-pain-medicine/pain-management-center/facet-and-medial-branch-blocks (last visited Mar. 8, 2022).

or "manag[ed]" Gagliardo's pain, and that her "medication regimen [was] effective" and helped her to exercise and "perform activities of daily living." E.g., R. 245, 297, 341, 349, 351, 357. Dr. Malits continued to renew Gagliardo's prescription for Percocet. E.g., R. 240, 281, 285.

Dr. Malits ordered several x-rays and MRIs of Gagliardo's spine and hips.[4] A November 13, 2015 x-ray of her hips and pelvis showed "unremarkable bilateral hips" and "no significant joint space narrowing or spurring" but "degenerative disc disease L4-5." R. 291. An August 22, 2016 MRI of her lumbar spine showed: "severe disc narrowing and associated endplate arthritis L4-5" that was "similar [to] previous" results and "[c]onsistent with degenerative disc disease"; mild levoscoliosis; a stable disc bulge at L2-3; a stable disc bulge and posterior ligament hypertrophy at L3-4 consistent with "borderline" mild spinal canal stenosis; a disc bulge and small central disc protrusion at L4-5 with posterior degenerative change, "stable" moderate spinal canal stenosis, and "unchanged" bilateral mild to moderate neural foramen stenosis greater on the right then on the left; and a stable disc bulge and mild posterior degenerative change at L5-S1 with mild left neural foramen stenosis and "stable appearance." R. 298-99. The overall impression was of "stable appearance previous," "[s]evere degenerative disc disease and moderate spinal canal stenosis L4-5," and the degenerative changes described. Id. A subsequent January 31, 2018 x-ray of Gagliardo's lumbar spine and hips showed "degenerative changes" in the lumbar spine (slight levoscoliosis, multilevel degenerative spurring, marked disc space narrowing at L4-5, moderate narrowing at L3-4, and multilevel facet degenerative change) and "degenerative changes" in the hips as compared to the November 2015 x-ray. R. 364-67.

---

[4] Dr. Malits noted on January 27, 2015, that Dr. Gross had ordered an MRI of Gagliardo's spine in June of 2014, and that the MRI was "notable for L4-L5, mild grade 1 anterolisthesis of L4 on L5, moderate-to-severe disk space narrowing and moderate multifactorial central canal stenosis at L5-S1" with a disc bulge at that level. R. 280. The record did not include a report of the 2014 MRI.

**2.     Stacy Spivack Gross, MD**

Gagliardo saw Dr. Gross, a physical medicine and rehabilitation specialist, every three to four months for her back and hip pain in 2017 and 2018. R. 305-06, 329-30, 331-33, 334-36, 337-39, 592-94, 595-97.

On April 13, 2017, Gagliardo saw Dr. Gross for an evaluation of her neck and back and reported pain in her lower back radiating to her hips and pain in her neck. R. 305. She told Dr. Gross that she could not sit for more than 30 minutes and had increased pain if she stood in one spot for more than 5 minutes. Id. While injections had not provided any relief, Percocet allowed her "to do the things that she needs to do throughout the day." R. 305. Gagliardo stated that she went to the gym 3 days a week, used an elliptical for 15 minutes (without using her arms), lifted 10-pound weights, used leg machines, and stretched. Id. Upon physical examination, she had tenderness in her cervical and lumbar paraspinal musculature, but the straight leg raise test[5] was negative, her deep tendon reflexes were not abnormal, and she had no pain with range of motion in her hips. R. 306. Dr. Gross wrote that Gagliardo was "currently not able to perform the job that she used to perform in either wholesale or store sale because" she would "have an increase in her symptoms." Id.

The following day, Dr. Gross completed a residual functional capacity form.[6] R. 204-09. She reported that she had seen Gagliardo eight times in four years, and that Gagliardo had chronic back pain, neck pain, and shoulder pain. Id. Based on the August 2016 MRI and an

---

[5] The straight leg raise test "is a fundamental maneuver during the physical examination of a patient with lower back pain. It aims to assess for lumbosacral nerve root irritation." Gaston O. Camino Willhuber & Nicolas S. Piuzzi, Straight Leg Raise Test, https://www.ncbi.nlm.nih.gov/books/NBK539717/ (last updated July 31, 2021).

[6] As the Commissioner notes, the signature on the report is illegible. The Court agrees, however, that the author's specialty (physical and medical rehabilitation), the report's timing (one day after the April 13, 2017 appointment), and the similarity of the signatures between this report and another written by Dr. Gross in 2018 all suggest that Dr. Gross prepared the report.

undated x-ray of Gagliardo's cervical, lumbar, and thoracic spine, Dr. Gross diagnosed

Gagliardo with cervical spondylosis and lumbar degenerative disc disease with stenosis that

previously had been treated with physical therapy and was now treated by pain management via

medication and injections. Id. Gagliardo's prognosis was chronic pain. Id. Dr. Gross opined that

Gagliardo's pain was supported by documented findings in imagining studies, citing the MRI. Id.

She could not sit upright or stand for 6 to 8 hours because of her back pain and needed to stand

up every 30 to 40 minutes. Id. She could frequently reach up above her shoulders, down to her

waist, and carefully handle objects, and she could rarely reach down towards the floor. Id. She

could lift and carry 5 to 10 pounds regularly, could not lift more than 10 pounds, and could

intermittently push 15 to 20 pounds. Id. She could not bend repetitively and could rotate her neck

only 45 degrees. Id. Kneeling would cause back pain. Id. Dr. Gross opined that Gagliardo could

not continue or resume work at her current or previous employment because she could not stand

or lift objects all day as required in retail employment. Id.

  At the April 13, 2017 appointment and at every appointment thereafter, Dr. Gross noted

that Gagliardo's gait was non-antalgic, that she was in no apparent distress, and that she

transitioned easily from a seated to standing position. R. 305-06, 329-30, 331-33, 334-36, 337-

39, 592-94, 595-97. Dr. Gross noted that she had limited and painless flexion of the lumbar spine

on November 13, 2017, R. 333, and limited extension and pain with flexion of the lumbar spine

on November 15, 2018, R. 597. The straight leg test was negative on February 12, 2018, May 14,

2018, August 15, 2018, and November 15, 2018, and Gagliardo's reflexes were generally

normal. R. 334-36, 337-39, 592-94, 595-97. On May 14, 2018, Gagliardo reported to Dr. Gross

that she had started barre exercise classes. R. 337-39. She attended barre class twice a week until

some time before August 15, 2018. R. 592-94. On November 15, 2018, Gagliardo reported that

she had increased thoracic pain. R. 47, 595-97. She was continuing to take Percocet three times a

day for pain control, which allowed her "to become more functional during the day." R. 595-97.

She was very comfortable taking the medication and had no side effects. Id. Upon physical

examination, Gagliardo's reflexes were normal, there was no tenderness over her cervical or

lumbar paraspinal musculature, and she had full range of motion of the cervical spine, but she

had pain with flexion of the lumbar spine and tenderness over the midline of the thoracic spine.

Id. Dr. Gross ordered an x-ray to evaluate for a possible compression fracture of the thoracic

spine.

The November 15, 2018 x-ray showed "mild/moderate degenerative changes manifested

by mild disc space narrowing, endplate changes, and mild/moderate anterior osteophytes most

pronounced in the upper mid thoracic spine." R. 598.

On November 19, 2018, Dr. Gross completed a second residual functional capacity

assessment. R. 599-600. She opined that Gagliardo's chronic pain affected her ability to lift,

carry, stand, and walk. Id. Gagliardo could frequently lift 0 to 5 pounds, occasionally lift 5 to 10

pounds, and never lift more than 10 pounds. Id. She could stand or walk for 4 hours in an 8-hour

work day if she could change positions every hour, and could sit for 4 hours if she could stand

every 30 minutes. Id. She could never climb or crawl, and could occasionally bend, balance,

stoop, crouch, and kneel. Id. She could occasionally reach and push or pull, and frequently feel

or handle objects. Id. The assessment did not include any supporting medical findings. Id.

### 3. Marilyn F. Jacobowitz, MD

Gagliardo saw Dr. Jacobowitz in 2017 and 2018 for reasons unrelated to her back and hip

pain. R. 313-15, 321-23, 603-10. On July 10, 2017, Dr. Jacobowitz reported that Gagliardo

looked well. R. 314. On December 8, 2017, Gagliardo told Dr. Jacobowitz that she "exercises all

the time." R. 321. She was assessed as having chronic bilateral low back pain without sciatica but "doing very well overall." R. 323. Finally, on December 17, 2018, Dr. Jacobowitz reported that Gagliardo suffers from back pain and had degenerative disc disease with an onset date of February 23, 2015. R. 607.

### 4.    Brett Axelrod, DC

After an initial consultation on November 7, 2016, Gagliardo received chiropractic treatments for back, neck, and hip pain at Elmsford Chiropractic from January to July of 2017 (39 visits) and January to July of 2018 (27 visits) under the care of Dr. Axelrod. R. 370-501, 502-89.

In January of 2017, Gagliardo rated her neck pain as a 6 out of 10 occurring 20 to 25% of her awake time and her back pain as an 8 or 9 out of 10 occurring 50 to 75% of her awake time. R. 370-95. Over the following months, the pain in her neck and back generally improved and occurred less frequently, e.g., R. 429-31, 439-41, but the pain increased after Gagliardo hurt herself while exercising and fell while cleaning, R. 442-46, 471-74, 484-89. She began experiencing hip pain in May of 2017, initially rating it as an 8 out of 10 occurring 100% of her awake time. R. 471-74. Dr. Axelrod noted at multiple appointments in June and July of 2017 that her hip pain was improving. R. 475-77, 496-98, 499-501. She had limited ranges of motion of her neck, back, and hips. E.g., R. 393, 433, 445, 487, 493.

In January of 2018, Gagliardo rated her neck pain as a 5 out of 10 occurring 30 to 50% of her awake time, her back pain as an 8 out of 10 occurring 25 to 50% of her awake time, and her hip pain as an 8 out of 10 occurring 25 to 50% of the time. R. 502-17. Over the following months, her pain generally improved, R. 533-35, 539-44, 551-53, 557-59, 566-68, 578-83, but worsened after sitting and standing for long periods of time, R. 569-74.

Dr. Axelrod generally reported that Gagliardo had pain with various ranges of motion in her cervical spine, lumbar spine, and hips, and spasms in her bilateral erector spinae muscles (and subsequently her left, then right piriformis muscles). See R. 370-501, 502-89. He described her pain as "low-moderate." Id. He periodically recorded comprehensive examinations involving multiple orthopedic tests that assess lumbar and sacroiliac joint involvement and pain (Kemp's, Yeoman's, Milgram's, Nachlas, straight leg raise, Ely's, Braggard's, FABER-Patrick's, and Trendelenburg tests). R. 373-75, 391-95, 442-46, 484-89, 490-95, 514-17, 521-26, 569-74. Dr. Axelrod sometimes reported that Gagliardo's tests were positive, e.g., R. 373-75, 391-95, 484-89, 490-95, 514-17, and sometimes negative, e.g., R. 442-46 (negative straight leg raise, Nachlas, Ely's, Braggard's tests; other tests positive), 521-26 (negative Nachlas, Ely's, Braggard's tests; other tests positive), 569-74 (negative straight leg raise, Nachlas, Ely's, Braggard's tests; other tests positive). He did not always perform every test. Gagliardo was generally ambulatory without assistance. R. 392, 443, 485, 491, 522, 570.

### C.  Non-Examining Agency Reviewer L. Durante

On March 9, 2017, Durante submitted a Medical Determinable Impairments and Severity Form after reviewing Gagliardo's medical records. R. 61-68. Citing Gagliardo's activities of daily living and longitudinal treatment records (in particular a September 12, 2016 physical examination with Dr. Malits, December 28, 2016 lumbar facet joint block and medial branch nerve block treatment, and January 16, 2017 follow-up appointment with Dr. Malits[7]), Durante stated that Gagliardo was capable of light work. Id. Durante considered whether Gagliardo's impairments qualified as a spine disorder under the listed disabilities ("Listings") in the applicable regulations. Id. According to Durante, while Gagliardo's impairments could

---

[7] The administrative record does not include a January 16, 2017 appointment with Dr. Malits but does denote one on January 13, 2017. R. 245-46. The Court assumes this to be typographic error.

reasonably be expected to produce her pain or other symptoms, her statements about the intensity, persistence, and functionally limiting effects of the symptoms were not substantiated by the medical evidence alone and were "generally not consistent with the evidence of record." Id. There was "no indication" of medical opinion evidence, and although the form noted that additional records were requested from Dr. Malits and Dr. Gross on February 1 and February 15, 2017, it is unclear whether Durante received those records and incorporated them into the analysis. Id.

Durante found that Gagliardo could occasionally carry 20 pounds, frequently carry 10 pounds, stand and/or walk for about 6 hours in an 8-hour workday, and sit for about 6 hours in an 8-hour workday. Id. She had postural limitations: she could frequently climb ramps, stairs, ladders, ropes, and scaffolds, and frequently balance, but could only occasionally stoop, kneel, crouch, or crawl. Id. She had no manipulative, visual, communicative, or environmental limitations. Id.  Durante determined that Gagliardo had the RFC to perform her past work as a sales associate, and while she had "some limitations in the performance of certain work activities," "these limitations would not prevent" her from doing so. Id. Durante concluded that Gagliardo was not disabled. Id.

## IV.  The ALJ's Decision

On March 13, 2019, the ALJ denied Gagliardo's DIB application. R. 18-24. The ALJ identified the administrative and procedural history, the applicable law, and her findings of fact and conclusions of law. Id.

At step one, she determined that Gagliardo had not engaged in any substantial gainful activity since September 22, 2016. R. 20. At step two, she found that Gagliardo's cervical spondylosis and lumbar degenerative disc disease qualified as severe impairments. Id. At step

three, she determined that her impairments did not equal the severity of any one of the listed disabilities ("Listings") in the applicable regulations. Id.; see 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526. Specifically, the ALJ found that the requirements of Listing 1.04A, B, or C (disorders of the spine) were not satisfied. There was no evidence of nerve root compression, no medical finding of spinal arachnoiditis, and no evidence that Gagliardo was unable to ambulate effectively. R. 20; 20 C.F.R. Part 404, Subpart P, App'x 1, § 1.04(A)-(C).

The ALJ next established Gagliardo's RFC. R. 21-24. The ALJ found that she had the RFC to perform light work, as defined in 20 C.F.R. § 404.1567(b), could never climb ladders, ropes, or scaffolds, and could occasionally climb stairs, ramps, balance, stoop, kneel, crouch, and crawl. Id. Gagliardo's impairments could reasonably be expected to cause her symptoms, but "her statements concerning the intensity, persistence, and limiting effects of [her] symptoms were not entirely consistent with the medical evidence and other evidence in the record." R. 23. In reaching this determination, the ALJ considered Gagliardo's testimony, her treatment records from Dr. Malits, Dr. Gross, and Dr. Axelrod, her x-ray and MRI reports, and opinion evidence from Dr. Gross. R. 21-24. She gave "some weight" to Dr. Gross's November 19, 2018 RFC assessment but "little weight" to Dr. Gross's April 14, 2017 RFC assessment. R. 23. She also gave some weight to Dr. Gross's April 13, 2017 assessment about Gagliardo's ability to perform her past work. The ALJ did not discuss Durante's assessment. R. 21-24.

At step four, given Gagliardo's RFC, the ALJ determined that she could perform past relevant work as a salesclerk and a personal shopper. R. 24. Comparing her RFC with the physical and mental demands of the work, the ALJ found that she was able to perform the work of a salesclerk or personal shopper "as generally performed." Id.

Because the ALJ found that Gagliardo was able to perform past relevant work, she concluded that Gagliardo had not been disabled through the applicable period and was not entitled to DIB. R. 24.

## V.      The Appeals Council's Determination

Following the ALJ's unfavorable decision, Gagliardo requested that the Appeals Council review the decision. See R. 1-4, 150-53. On May 11, 2020, the Appeals Council denied her request for review, making the ALJ's decision final. R. 1.

## DISCUSSION

## I.      Standard of Review

In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). An ALJ's determination may be set aside only if it is based upon legal error or it is not supported by substantial evidence. Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999) (quoting Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998)).

"Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). The Commissioner's findings as to any fact supported by substantial evidence are conclusive. Diaz v. Shalala, 59 F.3d 307, 312 (2d Cir. 1995); see also Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder."). Therefore, if sufficient evidence supports the ALJ's final decision, the Court must grant judgment in favor of the Commissioner, even if substantial evidence also

supports the plaintiff's position. See Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012) ("The substantial evidence standard means once an ALJ finds facts, we can reject those facts only if a reasonable factfinder would *have to conclude otherwise.*" (emphasis in original) (citations and internal quotation marks omitted)). Although deferential to an ALJ's findings, a disability determination must be reversed or remanded if it contains legal error or is not supported by "substantial evidence." See Rosa, 168 F.3d at 77.

## II.    Definition of Disability

A claimant is disabled under the Act if she demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A).  A "physical or mental impairment" is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." Id. § 423(d)(3). A claimant will be found to be disabled only if her "impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." Id. § 423(d)(2)(A).

An ALJ must proceed through a five-step process to make a disability determination. See 20 C.F.R. § 404.1520. The steps are followed in order; if it is determined that the claimant is or is not disabled at a step of the evaluation process, the evaluation will not progress to the next step. See id. The Court of Appeals has described the process as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. Where the claimant is not, the Commissioner next

considers whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment that is listed in 20 C.F.R. pt. 404, subpt. P, app. 1. . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the residual functional capacity to perform her past work. Finally, if the claimant is unable to perform her past work, the burden then shifts to the Commissioner to determine whether there is other work which the claimant could perform.

Jasinski v. Barnhart, 341 F.3d 182, 183-84 (2d Cir. 2003) (quoting Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1999)).

A claimant bears the burden of proof as to steps one, two, three, and four; the Commissioner bears the burden as to step five. Selian v. Astrue, 708 F.3d 409, 418 (2d Cir. 2013) (citation omitted).

### III. The ALJ's RFC Determination

Based on all of the relevant medical and other evidence available, including Gagliardo's own descriptions and observations, the ALJ found that Gagliardo had the RFC to perform light work with certain postural limitations described above. R. 21-24; see 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1545(a)(3). Gagliardo had the burden of proving she did not have the RFC to perform any substantial gainful activity. See 20 C.F.R. §§ 404.1512(a), 404.1545(a)(3).

Gagliardo argues that the ALJ's RFC determination is not supported by substantial evidence because ALJ rejected the medical opinion of Gagliardo's treating physician, which was supported by the record, and substituted her own lay opinion.

#### A.  Legal Standard

Because Gagliardo's DIB application was filed before March 27, 2017, 20 C.F.R. § 404.1527 guided the ALJ's analysis. Under the applicable regulations, when evaluating medical opinions by medical sources, ALJs generally give more weight to the medical opinion of a

treating physician than a non-treating physician. 20 C.F.R. § 404.1527(c)(1). Treating physicians are "likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations . . . ." Id. § 404.1527(c)(2); see also Petrie v. Astrue, 412 F. App'x 401, 405 (2d Cir. 2011). If the ALJ finds that a treating physician's medical opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, [the ALJ] will give it controlling weight." 20 C.F.R. § 404.1527(c)(2). Medically acceptable clinical and laboratory diagnostic techniques include consideration of a "patient's report of complaints, or history, . . . an essential diagnostic tool." Green-Younger v. Barnhart, 335 F.3d 99, 107 (2d Cir. 2003) (internal citation and quotation marks omitted).

The ALJ can discount a treating physician's opinion if the ALJ believes that it "lacks support or is internally inconsistent." Duncan v. Astrue, No. 09-cv-4462 (KAM), 2011 WL 1748549, at *20 (E.D.N.Y. May 6, 2011). "When other substantial evidence in the record conflicts with the treating physician's opinion, [] that opinion will not be deemed controlling. And the less consistent that opinion is with the record as a whole, the less weight it will be given." Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999). If the ALJ decides that the treating physician's opinion is not entitled to controlling weight, she must decide how much weight it should be afforded, considering: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's report; (4) how consistent the treating physician's opinion is with the record as a whole; (5) the specialization of the physician in contrast to the condition

being treated; and (6) any other significant factors. 20 C.F.R. § 404.1527(c)(2)-(6); Estrella v. Berryhill, 925 F.3d 90, 95-96 (2d Cir. 2019).

When the ALJ discredits the opinion of a treating physician, the regulations direct her to "always give good reasons in [the] notice of determination or decision for the weight [given a] treating source's opinion." 20 C.F.R. § 404.1527(c)(2); Snell, 177 F.3d at 133. She need not recite every piece of evidence in relation to these factors, however, so long as "the evidence of record permits [the Court] to glean the rationale of an ALJ's decision." Mongeur v. Heckler, 722 F.2d 1033, 1040 (2d Cir. 1983) (per curiam); see Marinez-Paulino v. Astrue, No. 11-cv-5485 (RPP), 2012 WL 3564140, at *16 (S.D.N.Y. Aug. 20, 2012) ("It is not necessary that the ALJ recite each factor explicitly, only that the decision reflects application of the substance of the rule."). Although an ALJ's failure to explicitly apply the factors is a procedural error and may be grounds for remand, if the Court determines upon "a searching review of the record" that "the substance of the treating physician rule was not traversed," affirmance is appropriate. Estrella, 925 F.3d at 96 (quoting Halloran, 362 F.3d at 32).

**B. Analysis**

The ALJ properly based her determination of Gagliardo's RFC on *all* the relevant evidence in the record, not just the medical opinion evidence. See 20 C.F.R. §§ 404.1527(d)(2), 404.1545(a)(3). "Where . . . 'the record contains sufficient evidence from which an ALJ can assess the [claimant's] residual functional capacity,' a medical source statement or formal medical opinion is not necessarily required." Monroe v. Comm'r of Soc. Sec., 676 F. App'x 5, 8 (2d Cir. 2017) (quoting Tankisi v. Comm'r of Soc. Sec., 521 F. App'x 29, 34 (2d Cir. 2013) (summary order)); cf. Pellam v. Astrue, 508 F. App'x 87, 90 (2d Cir. 2013) (upholding ALJ's RFC determination where he rejected physician's opinion but relied on physician's findings and

treatment notes). The ALJ properly cited the overall record in determining Gagliardo's RFC, including Gagliardo's testimony, treatment records, and medical imaging. <u>See</u> R. 21-23.

Substantial evidence in the record supports the ALJ's findings. At almost every appointment, Dr. Malits noted that Gagliardo's gait was non-antalgic, that she did not use any walking aids, and that she did not have any difficulty getting on and off the examination table. <u>See</u> R. 242-43, 245-46, 341-42, 343-44, 345-47, 348-50, 351-53, 354-56, 357-59. Dr. Gross similarly noted on multiple occasions that Gagliardo's gait was non-antalgic, that she was in no apparent distress, and that she transitioned easily from a seated to standing position. R. 305-06, 329-30, 331-33, 334-36, 337-39, 592-94, 595-97. Dr. Gross also reported that Gagliardo's straight leg test was negative on multiple occasions, and that her reflexes were generally normal. R. 334-36, 337-39, 592-94, 595-97.

The record shows that Percocet provided "good relief" or "manag[ed]" Gagliardo's pain, and that her "medication regimen [was] effective" and helped her to exercise and "perform activities of daily living." <u>E.g.</u>, R. 245, 297, 341, 349, 351, 357. As of November 2018, Gagliardo was very comfortable taking the medication and had no side effects. R. 595-97. Gagliardo remained active and reported both to her treating physicians and at the hearing that she went to the gym regularly to stretch and lift light weights. <u>E.g.</u> R. 48-49, 305-06, 331-33, 592-94. The ALJ's RFC determination that Gagliardo was capable of "light work" was therefore supported by the overall record, including her own testimony and Dr. Malits's and Dr. Gross's findings.

The ALJ also provided sufficient rationale for giving "some" weight to Dr. Gross's November 19, 2018 RFC form, which is the only medical opinion discussed in Gagliardo's argument. R. 23; ECF No. 17 (Br.) at 14, 22. The ALJ's decision was based on Dr. Gross's

"significant treating relationship" with Gagliardo and the form's inconsistency with the medical evidence of record, including Gagliardo's testimony about her consistent ability to "independently perform her activities of daily living, travel, and take care of her ailing mother." R. 23. Based on her review of the medical and other evidence of record, the ALJ concluded that Gagliardo's functional limitations were not of the degree alleged and were fully accommodated by the RFC determination.

The ALJ sufficiently considered the regulatory factors in affording Dr. Gross's November 19, 2018 opinion "some" weight. The ALJ properly noted Dr. Gross's "significant" treating relationship with Gagliardo, which spanned four years and at least seven visits. R. 19, 305-06, 329-30, 331-33, 334-36, 337-39, 592-94, 595-97. Additionally, before she made her finding as to the opinion evidence, the ALJ noted with particularity treatment records for certain of Gagliardo's appointments with Dr. Malits and Dr. Gross in 2016, 2017, and 2018, and records of Gagliardo's 2016 MRI and 2018 x-ray. R. 21-23. The ALJ specifically discussed the following findings: Gagliardo's pain was managed with Percocet but injections had been ineffective; she sometimes had pain with and reduced range of spinal motion; she appeared to be in no distress, had a non-antalgic gait, used no assistive devices, and had no difficulty getting on and off the examination table; and she reported to both Dr. Malits and Dr. Gross being able to exercise and otherwise conduct her daily activities of living. Id.; see also supra Sections III.B.1 (Dr. Malits treatment records), III.B.2 (Dr. Gross treatment records). The ALJ's discussion therefore sufficiently considered the length, nature, and extent of Dr. Gross's treatment relationship, and the evidence supporting her opinion.

While the ALJ did not specifically consider Dr. Gross's specialty in physical medicine and rehabilitation, an ALJ need not explicitly address each factor in 20 C.F.R. § 404.1527(c).

She must apply the "substance of the treating physician rule" and provide good reasons for the weight she accords to a treating physician's medical opinion. Halloran, 362 F.3d at 32-33; accord Botta v. Barnhart, 475 F. Supp. 2d 174, 188 (E.D.N.Y. 2007) ("Although the ALJ should 'comprehensively' set forth the reasons for the weight assigned to a treating physician's opinion, the failure to do so does not require remand if it can be ascertained from the entire record and the ALJ's opinion that the ALJ 'applied the substance' of the treating physician rule." (citations omitted)). The ALJ did so. She cited Gagliardo's MRI and x-ray, R. 22-23, described with particularity Dr. Malits's and Dr. Gross's examination findings, R. 21-23, and noted Gagliardo's testimony about her daily activities and the efficacy of pain medication, id. It is not enough that Gagliardo disagrees with the ALJ's weighing of the evidence. Again, "[t]he substantial evidence standard means once an ALJ finds facts, [the Court] can reject those facts 'only if a reasonable factfinder would *have to conclude otherwise*.'" Brault, 683 F.3d at 448 (emphasis in original) (citation omitted). The record supports the ALJ's conclusion.

## CONCLUSION

Gagliardo's motion is DENIED, and the Commissioner's motion is GRANTED. The action is DISMISSED with prejudice. The Clerk of Court is respectfully directed to terminate the motions at ECF Nos. 16 and 18.

**SO ORDERED.**

SARAH NETBURN
United States Magistrate Judge

DATED:      March 30, 2022
            New York, New York